**No. 23-30634**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,

*Defendants-Appellants,*

v.

ALEX A., by and through his guardian, MOLLY SMITH, BRIAN B.; and CHARLES C., by and through his guardian, KENIONE ROGERS, individually and on behalf of all other similarly situated,

*Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the Middle District of Louisiana

## DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

Connell Archey
Allena McCain
Madaline King Rabalais
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, LA  70802

Lemuel E. Montgomery III
Anna Morris
Carly Chinn
BUTLER SNOW LLP
1020 Highland Colony Pky., Ste. 1400
Ridgeland, MS 39157

Counsel for Defendants-Appellants

# CERTIFICATE OF INTERESTED PERSONS

No. 23-30634

GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,

*Defendants-Appellants,*

v.

ALEX A., by and through his guardian, MOLLY SMITH, BRIAN B.; and CHARLES C., by and through his guardian, KENIONE ROGERS, individually and on behalf of all other similarly situated,

*Plaintiffs-Appellees.*

Under Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

*/s/ Lemuel E. Montgomery III*
Lemuel E. Montgomery III

*Counsel for Defendants-Appellants*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ............................................................................ ii

INTRODUCTION AND NATURE OF EMERGENCY ........................................1

STATEMENT OF JURISDICTION ..............................................................2

INTRODUCTION AND BACKGROUND ......................................................2

    **1.**    The Need to Open BCCY-WF ......................................................3

    **2.**    Plaintiff Alex A. ......................................................................4

    **3.**    First Preliminary Injunction Motion .......................................5

    **4.**    Plaintiff Charles C. ..................................................................5

    **5.**    Second Preliminary Injunction Motion ...................................6

    **6.**    Status Quo Order .....................................................................6

    **7.**    The Preliminary Injunction .....................................................8

ARGUMENT AND AUTHORITIES ............................................................9

    **1.**    Serious Injury Is Likely to Occur Without a Stay ..................9

    **2.**    A Stay Serves the Public Interest. .........................................10

    **3.**    Defendants Have a Substantial Likelihood of Success on the Merits.10

    **A.**    Plaintiffs failed to exhaust administrative remedies. ...........10

        i.    Charles C. failed to exhaust administrative remedies..............12

        ii.    Alex A. failed to exhaust his administrative remedies. ............12

    **B.**    The Preliminary Injunction is not the least intrusive means to correct the alleged harm. ....................................................14

    **C.**    The Preliminary Injunction constitutes a "prisoner release order" that does not comply with PLRA requirements......................15

**D.**    Plaintiffs cannot establish deliberate indifference. .............................16

    i.    Use of a former adult facility is not deliberate
indifference. ...............................................................17

    ii.    Education at BCCY-WF meets constitutional
requirements. ............................................................18

    iii.    Rehabilitative services meet constitutional requirements.........19

    iv.    Use of cell restriction complies with constitutional
requirements. ............................................................21

**4.**    A Stay Poses No Risk of Injury to Plaintiffs......................................23

REQUEST FOR ADMINISTRATIVE STAY ......................................................24

CONCLUSION ......................................................................................24

CERTIFICATE OF SERVICE ...................................................................26

CERTIFICATE OF COMPLIANCE ..............................................................26

CERTIFICATE OF FACTS SUPPORTING EMERGENCY
CONSIDERATION ..................................................................................27

EXHIBIT LIST ......................................................................................28

## **INTRODUCTION AND NATURE OF EMERGENCY**

The district court ordered the Louisiana Office of Juvenile Justice ("OJJ") to depopulate and shutter one of its secure care facilities, the Bridge City Center for Youth at West Feliciana ("BCCY-WF"), by Friday, September 15, 2023. This injunction will almost certainly result in serious bodily injury to any number of youth, OJJ staff, and even private citizens.

BCCY-WF is OJJ's Transitional Treatment Unit ("TTU"), which houses high-risk youth who, while in OJJ's custody, committed acts of violence against other youth or OJJ staff, escaped, attempted to escape, and/or caused significant property destruction. BCCY-WF is OJJ's most secure facility, located on the campus of the Louisiana State Penitentiary ("LSP") at Angola.

BCCY-WF is necessary to protect other youth, staff, and the public from imminent and serious physical harm and for the orderly administration of rehabilitative services. Certain high-risk youth within OJJ's custody engage in violent behavior within OJJ's secure care facilities. This behavior has resulted in youth and staff suffering severe and, in some cases, permanent injuries. These high-risk youth have escaped OJJ facilities, committing violent crimes against the public, including assaults, carjackings, and shootings. In 2022, one high-risk youth escaped the OJJ facility, obtained a gun, carjacked, and shot a citizen, causing critical and

life-threatening injuries. BCCY-WF provides the required security to prevent such injuries.

At the district court's repeated requests, OJJ agreed to pause transfers to BCCY-WF during the hearing on Plaintiffs' Second Preliminary Injunction Motion. After only a few days, OJJ had to withdraw its agreement, because youth in other OJJ facilities learned of that agreement and acts of violence, aggression, and escapes increased in number and severity, resulting in riots; serious injuries to youth, staff, and law enforcement; and property destruction.

If the Preliminary Injunction takes effect, there will be a substantial risk—indeed, a near certainty—of serious bodily injury to the youth, OJJ staff, and (in the event of escapes) the public. The Court should stay the Preliminary Injunction pending appellate review.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction over the Preliminary Injunction under 28 U.S.C. § 1292(a)(1).

## INTRODUCTION AND BACKGROUND

Historically, OJJ maintained five secure care facilities:  Acadiana Center for Youth at Bunkie ("ACY"), Acadiana Center for Youth at St. Martinville ("ACY-SM"), Bridge City Center for Youth in Jefferson Parish ("BCCY"), Swanson Center for Youth at Monroe ("SCY"), and Swanson Center for Youth at Columbia. Ex. 2 at

12. OJJ facilities include dormitories, gymnasiums, outdoor recreational areas, schools, medical and counseling facilities, and dining areas. *Id.* at 13. Most youth in OJJ facilities live in dormitories with twelve to fifteen youth, where youth can move freely. *Id.*

Most youth in secure care respond well to rehabilitative programming. *Id.* at 13. A small number of youth do not. *Id.* at 13-23. These non-compliant youth commit violence against other youth and staff, destroy property, and attempt to escape. *Id.* These youth require additional, individualized attention. *Id.* at 17. OJJ provides that attention through its TTU program, wherein non-compliant youth live in more restrictive and secure housing and receive additional counseling.

### 1. **The Need to Open BCCY-WF**

The TTU was once located in Cypress Unit at SCY, which provided single rooms and locking doors. *Id.* at 15. In May 2021, high-risk youth completely destroyed the Cypress Unit. *Id.*

Having no secure location to house these youth, OJJ transferred them to the Ware facility in Alabama, which the youth also destroyed. *Id.* Soon after, Alabama officials demanded the youth's removal. *Id.*

OJJ then began housing these high-risk youth in dormitories at OJJ's existing facilities. *Id.* Destruction and violence ensued:

- On June 13, 2022, five youth at SCY were involved in a physical altercation, resulting in the battery of four staff members, one of whom was hospitalized. *Id.* at 16.

- On June 16, 2022, approximately 20 youth escaped their dormitory, took over part of BCCY, and caused a riot, resulting in injuries to two youth and one staff member who was hospitalized; five youth escaped. *Id.*

- On July 17, 2022, six youth escaped BCCY. Five youth stole a truck, repeatedly rammed a Sheriff's Deputy vehicle, and led officers on a pursuit before crashing the truck. The other youth carjacked another vehicle and shot and critically injured the driver. *Id.* at 16.

In July 2022, Governor Edwards announced plans to open a temporary secure care facility at BCCY-WF to house the high-risk youth, while OJJ constructed a permanent facility. BCCY-WF opened in October 2022 as OJJ's TTU. *Id.* at 17-19.

### 2. **Plaintiff Alex A.**

Alex A. is a youth in OJJ secure care. In August 2022, he was housed at BCCY in Jefferson Parish. On August 16, 2022, Alex A., through his attorney, filed an "Emergency ARP Application," demanding that OJJ not open BCCY-WF and complaining of fears he would be transferred to BCCY-WF, would be housed with adult inmates at BCCY-WF, and would not receive youth education, medical, and rehabilitation at BCCY-WF because an adult facility lacks such youth services.

OJJ denied emergency processing of Alex A.'s ARP because there was no plan to transfer Alex A. to BCCY-WF. Before receiving a final response to his ARP, Alex A. filed suit as the sole named plaintiff and filed the First Preliminary Injunction Motion to prevent BCCY-WF from opening.

### 3. First Preliminary Injunction Motion

A full evidentiary hearing was conducted on Plaintiff's First Preliminary Injunction Motion. The district court found the high-risk youth's conduct "caused significant disruption in OJJ's ability to deliver educational and rehabilitation services to the other youth in its custody" and caused physical injuries to youth, OJJ staff, and the public. Ex. 2 at 13-14.

The district court found "OJJ lack[ed] high security accommodations for the high-risk youth" and found "overwhelming[]" evidence of "an immediate need for a more secure facility." *Id.* at 16-17. The district court ruled that establishing the TTU at BCCY-WF was a necessary response to the violent, uncontrolled behavior of high-risk youth and denied Plaintiffs' motion. *See* Ex. 2 at 2-3, 18.

### 4. Plaintiff Charles C.

On October 25, 2022, Charles C., through his attorney, filed an "emergency" ARP with OJJ – nearly identical to Alex A.'s ARP. At the time, Charles C. was not

housed at BCCY-WF.[1] The same day Charles C. filed his ARP (before receiving a response), he filed his Amended Complaint.

### 5. **Second Preliminary Injunction Motion**

On July 17, 2023, Plaintiffs filed a Second Preliminary Injunction Motion. *See* Ex. 1. Unlike the First Motion, which focused on Alex A.'s fears of being in an adult facility, the Second Motion was aimed at conditions that allegedly began no earlier than April 2023. Specifically, Plaintiffs claim four BCCY-WF conditions present a risk of harm: (1) being housed in a building constructed for adult incarceration; (2) lack of constitutionally adequate education; (3) lack of rehabilitative services; and (4) improper use of cell restriction. An evidentiary hearing was conducted between August 15 and 30, 2023.

### 6. **Status Quo Order**

During the hearing, the district court twice requested that OJJ agree not to transfer additional youth to BCCY-WF before the Court ruled on the Motion (the "Status Quo Agreement"). OJJ initially agreed but, within days, had to withdraw consent due to youth violence. *See* Ex. 4. The increase in frequency and severity of aggressive violence appeared to stem from youths' awareness that transfer to BCCY-WF was not available. *See id.*[2] Dangerous conduct included:

---

[1] Charles C. was housed at BCCY-WF from June 2 to August 2, 2023.
[2] The youth acknowledged the policy change and even taunted staff with it. *See* Ex. 10.

- On August 26, 2023, two youth in ACY (Youth 3 and Youth 10) threatened and assaulted Juvenile Justice Specialist ("JJS") Darel Augustine, including punching the back of his head, choking him, and kicking him in the face. *See* Ex. 5.

- On August 27, 2023, four youth escaped from ACY. *See* Ex. 6. Youth 3 and Youth 10 used a pipe to attack JJS Darelle Cooks and steal his keys. *Id.* Other youth attacked the facility's Assistant Director, punching and kicking her in the stomach, and taking her keys and phone. *Id.* The youth unlocked dormitories, releasing youth who then engaged in riots and youth-on-youth attacks. *Id.*

- Youth 3 and Youth 10 were among those who escaped ACY. *Id.* They were detained and charged with Battery of a Correctional Facility Employee and Aggravated Escape. *Id.* Youth 3 and Youth 10 then told ACY staff they have plans and methods to escape other OJJ facilities *except* BCCY-WF. *Id.*

- Two other youth who escaped ACY remained at large until August 28, 2023—one was charged with Simple Escape; the other was charged with Aggravated Escape, Second Degree Battery, Battery of a Police Officer, and Resisting an Officer. *Id.*

- During the Status Quo Agreement, OJJ could not transfer these youth to BCCY-WF and instead transferred them to ACY-SM. *Id.* On September 3,

2023, Youth 3 and Youth 10 were involved in another major riot. *See id.*; Ex.
7. Youth broke out of their rooms and armed themselves, forcing OJJ staff to
evacuate. *Id.* Youth 3 and Youth 10 broke metal shower dividers and used
them to smash through the wall into the hallway. *Id.* Youth 10 armed himself
with a seven-foot-long metal pipe. *Id.* Youth 3 and Youth 10 threatened to kill
OJJ staff if they came into the hallway. *Id.* Youth in other dormitories then
destroyed property, armed themselves, and engaged in riots. *Id.* St. Martin
Parish Sheriff's Department was called to regain control of the facility. *See
id.*; Ex. 8.

### 7.  **The Preliminary Injunction**

The district court read in open court the Preliminary Injunction ruling on
Friday, September 8, 2023. The district court has not released a written opinion or
transcript. On Monday, September 11, 2023, Defendants filed a notice of appeal (Ex.
18) and moved for a stay pending appeal (Ex. 19). The district court denied the stay.
Ex. 21.

Defendants now seek a stay in this Court under Fed. R. App. P. 8(a)(2) and
respectfully request a ruling by **5:00 p.m. on September 14, 2023**, or, alternatively,
a temporary administrative stay pending this Court's consideration of this motion.

# ARGUMENT AND AUTHORITIES

"An appellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All four stay factors are met: (1) Defendants will suffer irreparable harm without a stay; (2) a stay serves the public interest; (3) Defendants are likely to succeed on the merits; and (4) a stay will not harm Plaintiffs. *Id.*

## 1. Serious Injury Is Likely to Occur Without a Stay.

The Preliminary Injunction must be stayed to avoid substantial risk of violence. OJJ is charged with the safety and security of all youth in its care. The TTU is a necessary tool to safely house youth—not only youth in the TTU but all youth. Closing the TTU at BCCY-WF presents a substantial risk of serious bodily harm to all youth in OJJ custody, OJJ staff, and the public.

The Preliminary Injunction also injures defendants because it intrudes in state affairs. Courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d 993, 996 (5th Cir. 1977). Intervention here is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996. The State has assigned juvenile detention policy to OJJ. The injunction prevents the State from effectuating

the legislature's choice and thus, "imposes irreparable injury." Ex. 2 at 60-61 (citing *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)).

## 2. A Stay Serves the Public Interest.

The public has a vested interest in the future and rehabilitation of youth in OJJ custody. Ex. 2 at 62. The Preliminary Injunction requires all youth at BCCY-WF to be transferred to other facilities, but these youth have demonstrated they cannot safely or successfully be rehabilitated at other facilities. Additionally, the violence and destructive behavior of these youth interferes with OJJ's ability to deliver education and rehabilitative services to other youth in OJJ's custody. *See* Ex. 2 at 61-62.

The public also has an interest in maintaining public safety. Ex. 2 at 62. The TTU is necessary to prevent high-risk youth from escaping custody and causing injuries to the public.

## 3. Defendants Have a Substantial Likelihood of Success on the Merits.

### A. Plaintiffs failed to exhaust administrative remedies.

Plaintiffs sue under 42 U.S.C. § 1983, the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12101. *See* Ex. 11 at 35-37. "[N]o action shall be brought under [S]ection 1983 …, or any other Federal law, by a prisoner confined in any … correctional facility until such administrative remedies

as are available are exhausted." 42 U.S.C. § 1997e(a).[3] Accordingly, Plaintiffs' claims are subject to the PLRA. *See Ferrington v. Louisiana Dep't of Corr.*, 315 F.3d 529, 532 (5th Cir. 2002).

Under the PLRA, Plaintiffs must exhaust before filing suit. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004); *Wilson v. Epps*, 776 F.3d 296, 299 (5th Cir. 2015). Where a prisoner raises new and distinct claims in a motion for preliminary injunction, the PLRA also bars those claims if they are not exhausted. *See, e.g.*, *Tolliver v. Collins*, 2010 WL 2640061, at *2 (S.D. Ohio April 29, 2010); *see also* *Jimerson v. Rheams*, No. 21-119, 2021 WL 2005492, at *1 (M.D. La. April 15, 2021) (quoting *Muhammed v. Wiles*, 841 Fed. App'x 681, 685-86 (5th Cir. 2021)). "Proper" exhaustion requires the plaintiff to comply with agency deadlines and procedural rules. *Woodford v. Ngo*, 548 U.S.81, 90 (2006). The Fifth Circuit takes "a 'strict' approach to [PLRA's] exhaustion requirement." *Wilson*, 776 F.3d at 299-300.

OJJ has an Administrative Remedy Procedure ("ARP"). *See* Ex. 12.

*Standard ARP*: A youth must exhaust a two-step grievance process. *See id.* at 9. A youth initiates Step 1 by filing an ARP form. *Id.* at 6–7. The facility director must respond within 30 days. *Id.* at 7. If the youth is dissatisfied, he has 15 days to

---

[3] "Prisoner" includes youth adjudicated as delinquent. 42 U.S.C. § 1997e(h).

exercise Step 2, seeking review from the Deputy Secretary of Youth Services. *Id.* at 8. The Deputy Secretary must respond within 21 days of the request. *Id.* at 9.

*Emergency ARP*: If the youth's grievance states he believes he is at immediate risk of harm and that any delay would subject him to substantial risk of immediate personal injury or other serious or irreparable harm, the ARP is immediately forwarded to the Facility Director, Statewide Youth Facilities Director, and Deputy Secretary. *Id.* at 9–10. OJJ must provide an initial response within 48 hours. *Id.* If reviewers determine the grievance is emergent, OJJ has five calendar days to provide a final decision. *Id*. If reviewers determine the grievance is not emergent, the grievance is processed as a standard ARP.

### i.    *Charles C. failed to exhaust administrative remedies.*

 On October 25, 2022, before Charles C. was ever housed at BCCY-WF and before the conditions alleged in the Second Motion for Preliminary Injunction existed, Charles C. filed an "emergency" ARP. *See* Ex. 13. That same day, he joined this lawsuit by filing his Amended Complaint. *See* Ex. 11. Charles C. did not exhaust before filing suit.

### ii.    *Alex A. failed to exhaust his administrative remedies.*

Alex A. has never been housed at BCCY-WF. On August 16, 2022, two months before BCCY-WF opened, Alex A. filed an emergency ARP complaining of OJJ's purported "decision to imminently move" Alex A. to BCCY-WF. *See* Ex. 14.

OJJ denied the request for emergency consideration because Alex A. was not housed at BCCY-WF and was not subject to the alleged conditions. *See* Ex. 15.[4] The district court incorrectly ruled that OJJ's denial of emergency treatment of Alex A.'s ARP constituted a decision upon which Alex A. could rely in filing suit.

Even if OJJ's denial of emergency treatment for Alex A.'s ARP constituted exhaustion, such exhaustion was limited to the claims raised in the ARP. Alex A.'s ARP did not properly exhaust the claims raised in the Second Preliminary Injunction Motion for several reasons.[5]

First, none of the current conditions alleged at BCCY-WF existed when Alex A. filed his grievance. BCCY-WF did not open until two months <u>after</u> he filed his grievance.

Second, Alex A. has never been exposed to any conditions at BCCY-WF because he never resided there.

Third, Alex A.'s grievance concerned materially different complaints from those in the Second Preliminary Injunction Motion. The PLRA requires grievances to be "sufficiently specific to give officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Petzold v. Rostollan*, 946 F.3d 242, 254-

---

[4] OJJ processed Alex A.'s grievance as a standard ARP. At the time the original Complaint was filed, the deadline for OJJ to respond. Ex. 16. Therefore, Alex A. failed to exhaust his administrative remedies before filing the Complaint and First Preliminary Injunction Motion.
[5] Because Charles C.'s and Alex A.'s ARPs were nearly identical, Charles C. failed to exhaust the claims in the Second Preliminary Injunction Motion for the same reasons discussed regarding Alex A.

55 (5th Cir. 2019). A grievance about one particular incident does <u>not</u> exhaust claims that arise from future incidents of the same general type. *Yankton v. Epps*, 652 Fed. App'x 242, 245-46 (5th Cir. 2016).

Alex A. grieved his fears of being housed with adult prisoners and his suspicion he would be denied youth services that were unavailable at an adult facility. Ex. 14. But the current allegations are that:

- OJJ is excessively using cell restriction to punish youth at BCCY-WF (not to create sight and sound separation between youth and adult prisoners); and

- Youth education and rehabilitation services at BCCY-WF are constitutionally deficient (not that services are withheld because BCCY-WF is at an adult penitentiary that does not offer youth services).

Exs. 1 & 17. The claims in the Second Preliminary Injunction Motion were never grieved by Alex A. OJJ was never put on notice of those specific grievances and was never afforded an opportunity to resolve them before litigation.

**B. <u>The Preliminary Injunction is not the least intrusive means to correct the alleged harm.</u>**

Under the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

Federal courts are to "eschew toward minimum intrusion into the affairs of state prison administration." *Gumns*, 2020 WL 2510248, at *3.

Shutting down BCCY-WF is the <u>most</u> intrusive means to correct the alleged harm. The district court already ruled that the BCCY-WF facility, itself, does not violate the Constitution. *See* Ex. 2 at 62. It is not necessary to close BCCY-WF to comply with the Constitution. If the district court found education and rehabilitation services or the use of cell restriction at BCCY-WF violates youth rights, the injunction must be narrowly drawn to address those alleged violations.

### C. <u>The Preliminary Injunction constitutes a "prisoner release order" that does not comply with PLRA requirements.</u>

A "prisoner release order" is "any order, including … preliminary injunctive relief … that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4).[6] The Preliminary Injunction, which directs that all youth be transferred from and that no youth be admitted to BCCY-WF, is a prisoner release order. *See Ruiz v. Estelle*, 161 F.3d 814, 825-27 (5th Cir. 1998), *abrogated on other grounds as recognized in Camp v. McGill*, 789 Fed. Appx. 449, 450 n.6 (5th Cir. 2020). Before a prisoner release order can issue, the PLRA requires that: (1) the court must have previously entered an order for less intrusive relief that failed to remedy the deprivation of the Federal right; and (2) the defendants must have been

---

[6] "Prison" includes juvenile facilities. 18 U.S.C. § 3626(g)(5).

given a reasonable amount of time to comply with the prior order. *See* 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). A prisoner release order can only be issued by a three-judge panel. *Id.* at § 3626(a)(3)(B), (E). These requirements are not satisfied.

### D. Plaintiffs cannot establish deliberate indifference.

Liability under § 1983 requires proof that prison officials acted with deliberate indifference to a substantial risk of serious harm. *See Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (Fourteenth Amendment claim). This is "an extremely high standard to meet." *Valentine*, 956 F.3d at 801 (citation omitted). Negligence, or even gross negligence, is not enough. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). Deliberate indifference requires deprivation of "basic human needs." *Valentine*, 956 F.3d at 801.

A two-part test applies to prove deliberate indifference. *Id.* First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference to that risk; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

Plaintiffs generally claim youth at BCCY-WF are subjected to four risks of harm: (1) being housed in a building constructed for adult incarceration; (2) lack of

16

constitutionally adequate education; (3) lack of rehabilitative services; and (4) improper use of cell restrictions. Plaintiffs presented no evidence to show a likelihood of proving deliberate indifference.

### i.     *Use of a former adult facility is not deliberate indifference.*

The fact that the facility at BCCY-WF previously housed adult inmates does not violate the Constitution. At the hearing on Plaintiffs' First Preliminary Injunction Motion, Plaintiffs presented three witnesses on this subject:

- Expert Dr. Stevens testified she did not like the decision to move youth to BCCY-WF but offered no diagnosis or prognosis for the lone plaintiff Alex A. and no testimony he will suffer any particular symptom caused by being housed at "Angola." She ultimately characterized her own testimony as "speculation."

- Expert Mr. Schiraldi admitted that moving youth to BCCY-WF violates no laws or accepted industry standards for juvenile detention. Mr. Schiraldi had no literature stating youth should not be housed in a former adult facility and admitted no such literature exists.

- Alex A. testified unequivocally that his only concern about BCCY-WF was the risk of assault by adult inmates. It is undisputed that no youth housed at BCCY-WF has ever had sight or sound exposure to (let alone physical contact with) an adult inmate.

17

As for the subjective component, OJJ actively investigated other options for housing these high-risk youth and ultimately concluded that BCCY-WF was the only available facility that met agency needs. Ex. 2 at 53-54.

### ii.    *Education at BCCY-WF meets constitutional requirements.*

The education provided to BCCY-WF youth complies with constitutional and Louisiana Department of Education ("LDE") standards.

The undisputed evidence was that from October 2022 to April 2023:

- BCCY-WF had full-time teachers;

- Classes were between seven and fifteen students, with a teacher/student ratio of less than 1:8; and

- Education was offered through live instruction, Edgenuity (an online program approved by LDE for public schools), and written workbooks.

The undisputed evidence is that during summer session (May 22 – July 13, 2023):

- BCCY-WF provided six hours of education per weekday, offering "catch up" services to youth who needed additional academic coursework;

- BCCY-WF provided one full-time teacher for up to 15 youth; the second teacher resigned after she was assaulted by youth;

- OJJ filled the second teacher position with teachers, principals, and administrators from other OJJ facilities; and

- Edgenuity and written workbooks were offered to the youth every day.

Plaintiffs' evidence attacking education at BCCY-WF was:

- During the first three days of the 2023-24 school year, some students' education plans were missing. But after those few days, it was undisputed that all education plans were obtained, and education has been in place and offered to BCCY-WF youth in the new school year.

- Starting round May 2023, some education was provided on housing tiers, but the undisputed evidence was that youth had destroyed two of the three classrooms at BCCY-WF, forcing relocation. Plaintiffs presented no evidence that providing education on the tiers resulted in a level of education below the constitutional minimum. After the youth-caused destruction, OJJ rotated groups of youth between one available classroom and the housing tiers for education. It is undisputed that OJJ has repaired and reopened one classroom and is currently working to repair the other.

### iii.    *Rehabilitative services meet constitutional requirements.*

Facility Director Linda London and Dr. Lee Underwood (clinical psychologist and juvenile justice expert who developed the TTU curriculum) testified that a multi-disciplinary team develops a plan for each youth at BCCY-WF. The team meets weekly to discuss the needs and progress of each youth in the program. Sandra Bryant, Social Services Supervisor, meets daily with each youth; Dr. Underwood visits the facility monthly and participates telephonically in weekly review meetings.

Three JJS staff members testified about trust-based relationship building when youth are introduced into the TTU and how staff leverage their relationships with youth to lead youth to invest in rehabilitative programming. Dr. Underwood testified about the introspective nature of the behavioral intervention curriculum and how it is designed to help youth reflect on prior habits of negative decision making and to use specific learning strategies to practice improving behavioral traits. Dr. Underwood and Ms. Bryant testified about the three-phase treatment program and accompanying curriculum. Written curriculum workbooks were introduced into evidence—in blank copy and with examples completed by youth. The district court excluded evidence supporting the efficacy of the TTU program, but Dr. Underwood and Deputy Secretary Nelson testified that most youth who complete the TTU program do not return, suggesting program goals are being met.

Trial evidence was also clear as to OJJ's provision of medical and mental health treatment within the TTU.  Rashied Cormier, Regional Mental Health Director for Wellpath,[7] testified about mental health services at BCCY-WF. Plaintiffs did not point to single anecdotal instance where any youth at BCCY-WF was allegedly denied medical or mental health treatment.

---

[7] OJJ contracts with Wellpath to provide medical and mental health services.

### iv.     *Use of cell restriction complies with constitutional requirements.*

There is no per se prohibition on cell restriction. Rather, juvenile facilities are entitled to enforce disciplinary rules and impose restrictions necessary to achieve security. "An effective discipline system is necessary … to aid staff in controlling violence and other inappropriate behavior, to maintain safety and security, and to serve as a training tool for the overall purpose of correcting the juveniles' behavior." Ex. 2 at 54 (citation omitted). "The level of restraint to be used for each juvenile should be based upon some rational professional judgment as to legitimate safety and security needs." *Id.* at 56 (citation omitted). To strike the balance between a punitive and rehabilitative program, the district court recognized, "The management of a detention facility and the preservation of safety and security at the facility present a compelling 'alternative purpose' for regulatory measures, including temporary suspension of a privilege or the imposition of administrative confinement, however denominated, without implicating the Due Process Clause…." *Id.* at 58 (citation omitted).

Plaintiffs presented no evidence that any youth has been on cell restriction for any reason except serious and immediate threats of harm—property destruction, youth or staff assault, and escape—circumstances that constitute a legitimate "alternative purpose." Plaintiffs worked actively to avoid admitting evidence

showing why youth were placed on cell restriction, and the district court refused to accept evidence of OJJ's bases for placing youth on cell restriction.

Nevertheless, it went undisputed that cell restriction was rarely used at BCCY-WF from its opening in October 2022 until Summer 2023, when a group of highly problematic youth, including Charles C., were transferred to BCCY-WF. It also went undisputed that the use of cell restriction significantly declined in August after those youth were transferred to other facilities.

To the extent Plaintiffs rely on Louisiana Revised Statute 15:905—the state statute restricting solitary confinement of youth—their reliance is misplaced. First, Plaintiffs have <u>not</u> pled a claim for any alleged violation of La. R.S. 15:905. Courts are to disregard claims that are not expressly pled. *Allstate Ins. Co. v. Plambeck*, No. 08-CV-0388-M-BD, 2012 WL 2130982, at *4 (N.D. Tex. Jan. 4, 2012).

Second, violation of a state statute (without more) is not a Constitutional violation under § 1983. *Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005). To violate the Constitution, a defendant's violation of state law must "shock the conscience." *Whitley v. Hanna*, 726 F.3d 631, n.2 (5th Cir. 2012) (citing cases).[8]

Third, "cell restriction" is not "solitary confinement." "Solitary confinement" is defined as "the involuntary placement of a juvenile alone in a cell." La. R.S.

---

[8] Federal courts are prohibited from enjoining state officials solely to require them to adhere to state law, pursuant to *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-11 (1984).

15:905. In cell restriction at BCCY-WF, youth are never alone. The undisputed evidence is that while on cell restriction, OJJ staff has "constant" engagement with each youth. Youth on cell restriction receive meals, education, medical treatment, mental health services, family visits/calls, recreation, television, and books; a youth on cell restriction interacts with other youth on the housing tier, including talking, passing notes, and watching television together.

Fourth, even if cell restriction was solitary confinement, the statute allows solitary confinement for "serious and immediate threat of physical harm to the juvenile or others." La. R.S. 15:905. Plaintiffs presented no evidence of arbitrary use of cell restriction, and the Court refused to accept evidence of OJJ's bases for imposing cell restriction. Without the underlying reasons for assigning youth to cell restriction, the Court was left only to guess whether cell restriction at BCCY-WF was "excessive."

### 4. A Stay Poses No Risk of Injury to Plaintiffs.

As to the merits of their § 1983 claim, Plaintiffs presented no evidence of an intolerable risk of harm or injury. To establish entitlement to injunctive relief, Plaintiffs also failed to present evidence of any irreparable injury. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (explaining the heavy burden to establish irreparable injury where adequate relief is available under plaintiff's asserted claim).

Here, Plaintiffs presented no evidence that they (or any youth actually housed at BCCY-WF) has suffered or is at risk of irreparable harm.

## REQUEST FOR ADMINISTRATIVE STAY

Defendants are entitled to a stay pending appeal and respectfully request the Court enter an order granting a stay by **5:00 p.m. on September 14, 2023**. Alternatively, Defendants request the Court immediately enter an administrative stay while it considers this motion; such administrative stays are routine. *E.g., In re Abbott*, No. 20-50296, 2020 WL 1855882, at *1 (5th Cir. Apr. 11, 2020). A temporary administrative stay will prevent irreparable harm to Defendants while the Court considers this motion.

## CONCLUSION

The Court should stay the district court's injunction pending appeal. The Court should also enter a temporary administrative stay immediately while it considers this motion.

Dated: September 13, 2023

        Respectfully submitted,

        BY: */s/Lemuel E. Montgomery III*
            Connell Archey
            Allena McCain
            Madaline King Rabalais
            BUTLER SNOW LLP
            445 North Boulevard, Suite 300
            Baton Rouge LA  70802
            Telephone:    (225) 325-8700

Facsimile:     (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

Lemuel E. Montgomery III
Anna Morris
Carly Chinn
BUTLER SNOW LLP
1020 Highland Colony Pky., Ste. 1400
Ridgeland, MS 39157
Telephone: (601) 948-5711
Facsimile: (601) 985-4500
Lem.Montgomery@butlersnow.com
Anna.Morris@butlersnow.com
Carly.Chinn@butlersnow.com

Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

On September 13, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Lemuel E. Montgomery III*
LEMUEL E. MONTGOMERY III

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,199 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Lemuel E. Montgomery III*
LEMUEL E. MONTGOMERY III

## **CERTIFICATE OF FACTS SUPPORTING EMERGENCY CONSIDERATION**

In compliance with Fifth Circuit Rule 27.3, undersigned counsel certifies

that the facts supporting emergency consideration of the motion are true and

complete.

*/s/ Lemuel E. Montgomery III*

LEMUEL E. MONTGOMERY III

## **EXHIBIT LIST**

**Ex. No.**   **Document**

1.  Plaintiffs' Second Motion for Preliminary Injunction

2.  Ruling on Plaintiff's First Motion for Preliminary Injunction

3.  Plaintiff's First Motion for Preliminary Injunction

4.  Declaration of Curtis Nelson

5.  Declaration of Joselyn Murray

6.  Declaration of Courtney Myers

7.  Declaration of Christopher Arnaud

8.  Declaration of Connell Archey

9.  Declaration of Travion Gordon

10.  Declaration of Nicholas Matthews

11.  First Amended Class Action Complaint

12.  ARP Policy

13.  Charles C. ARP

14.  Alex A. ARP

15.  Denial of Emergency Treatment for Alex A. ARP

16.  Class Action Complaint

17.  Memorandum in Support of Plaintiffs' Second Motion for Preliminary Injunction

18.  Notice of Appeal

19.  Motion to Stay Preliminary Injunction Pending Appeal

20.  Ex Parte Motion to Expedite Consideration of Motion to Stay Preliminary Injunction Pending Appeal

21.  Order Denying Motion to Stay Preliminary Injunction Pending Appeal

82454308.v1